UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARNET ANALYTICS, INC.<br><br>Plaintiff,<br><br>vs.<br><br>DIVERSIFIED SOLUTIONS, INC., MICHAEL LUNDY AND BRIAN SOL<br><br>Defendants. | CIVIL ACTION NO.<br><br>May 14, 2012 |

## COMPLAINT

Plaintiff Garnet Analytics, Inc. hereby alleges as follows:

**Parties and Jurisdiction**

1.  Plaintiff Garnet Analytics, Inc. ("Garnet" or "Plaintiff") is a corporation organized under the laws of the State of Connecticut having a principal place of business in Monroe, Connecticut.

2.  Defendant Diversified Solutions, Inc. ("DSI") is a corporation organized under the laws of the State of California having a principal place of business in Morgan Hill, California.

3.  Defendant Michael Lundy is an individual residing in Austin, Texas, and is the President of DSI.

4.  Defendant Brian Sol is an individual residing in Sparks, Nevada, and is the Vice President of DSI.

**Jurisdiction and Venue**

5. This Court has subject matter jurisdiction over Plaintiff's state-law claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) promissory estoppel, (4) quantum meruit, (5) negligent misrepresentation, (6) fraud, and (7) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a to 110q, in that the Plaintiff is a citizen of Connecticut and the Defendants are citizens of other United States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and attorney's fees. 28 U.S.C. § 1332(a)(2).

6. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this State, because the writing memorializing the underlying agreement of the parties stipulates Connecticut as the forum for disputes, and because certain tortious acts committed outside the State have their effect in this State. 28 U.S.C. § 1391(b); Conn. Gen. Stat. § 33-929(f); Conn. Gen. Stat. § 52-59b(a).

**Common Allegations: Excise Tax Refund Activities and Agreements**

7. Beginning in 2008 and continuing to the present, at DSI's request, Garnet agreed to provide analytical services to DSI, and to prepare tax studies and Internal Revenue Service tax forms for DSI clients in support of the clients' telephone excise tax refund claims, and DSI agreed to compensate Garnet for doing so.

8. At all relevant times, the services Garnet provided to DSI have included the following:

(a) Participating with DSI personnel as part of DSI "client teams" working with DSI clients on excise tax refund claims, with DSI personnel serving as liaison with the clients but Garnet performing all substantive data analysis, tax study and tax form preparation;

(b) Identifying, obtaining, reviewing and analyzing DSI clients' records in support of excise tax refund claims;

(c) Preparing audit-ready binders of documents and supporting material and delivering them to DSI clients for submission to the IRS; and

(d) Conferring with IRS staff to explain and support methodology employed to document refund claims.

9. In the course of performing the foregoing services, Garnet refined certain statistical methods to analyze client records and support excise tax refund claims. Through conferences with IRS staff, Garnet, and particularly Garnet's principal, Denise Plude, convinced IRS staff of the reliability of Garnet's statistical sampling methods, and developed a level of rapport and credibility that materially enhanced efforts to obtain excise tax refunds.

10. In the course of performing the foregoing services, Garnet from time to time made use of employees and interns associated with Kaskie Plude and Company, LLC ("Kaskie Plude"), an accounting firm owned by Michael S. Plude, C.P.A., husband of Denise Plude. Time devoted to Garnet work by Kaskie Plude employees was tracked by time and billing software and their time was treated as chargeable to Garnet. Garnet from time to time paid Kaskie Plude for such time, subject to final adjustment of accounts when work on all excise tax refund applications was complete and all amounts

due from DSI had been received. DSI was aware of the involvement of Kaskie Plude employees and regularly identified them as part of the DSI "project team" in communications with DSI's clients.

11. DSI receives a portion of its clients' excise tax refunds as compensation for activities in support of excise tax refund applications.

12. As compensation for Garnet's services, DSI agreed to pay Garnet, and until March 2012 did pay, a fee calculated by reference to the hours devoted by principals and staff to excise tax matters, subject to a cap of 20% of the fee DSI's clients paid DSI. The 80/20 split was based on DSI's representations that it would employ highly qualified sales staff to develop clients with substantial refund claims that would be profitable at the 80/20 level. DSI staff referred to clients with such larger refund claims as "whales."

13. In May and June 2009, in a series of conversations, Michael Plude expressed concern that many of the refund applications involved small amounts that did not generate fee income commensurate with effort. Mr. Lundy reaffirmed that experience to date would provide a foundation of positive referrals that would enable DSI's sales staff to develop engagements with the "whales" that would make the arrangement profitable for Garnet.

14. In practice, DSI did not require Garnet to provide detail of hours worked by individual staff and principals, but routinely notified Garnet of the amount of taxes and interest refunded to DSI's clients, and DSI routinely instructed Garnet to render invoices in amounts equal to 20% of the total paid to DSI. In practice, the time devoted to the excise tax refund applications by staff and principals working on behalf of Garnet

consistently exceeded the 20% cap, such that the fees charged by Garnet and paid by DSI would have been capped at 20% of the amount received by DSI even if DSI had requested detail as to hours worked.

15. The foregoing practices, including DSI's routine payment to Garnet of 20% of client payments to DSI, continued without interruption until late March 2012. Over that period, Garnet worked with DSI on successful excise tax refund claims for over forty DSI clients, on which DSI's clients paid DSI more than $2.8 million. Over that period, DSI consistently paid the agreed 20% of its fees to Garnet, amounting to over $571,000. Throughout that period, DSI did not request hourly billing detail from Garnet in support of its charges.

16. In 2009 and 2010, Garnet, through its president Denise Plude, exchanged correspondence with DSI about documentation to confirm the terms on which Garnet had been and was providing services to DSI. Among other things, the correspondence expressly confirmed that Garnet calculated the value of time spent on DSI client matters at two rates - $250 per hour for staff, and $500 per hour for principals. On behalf of DSI, both Mr. Lundy and Mr. Sol reviewed the draft letter agreement. DSI requested certain changes to the letter agreement, which Ms. Plude incorporated before executing it on behalf of Garnet as Garnet's President and returning it to DSI by email on April 23, 2010. At no time did Mr. Lundy or Mr. Sol dispute that the letter agreement sent to them on April 23, 2010 ("Letter Agreement") accurately stated the agreed terms for Garnet to provide services to DSI. They understood no later than that date that the terms stated in the Letter Agreement expressed Garnet's understanding of the agreement between the parties and Garnet's expectations concerning compensation for its work on behalf of

DSI clients. A copy of the Letter Agreement is attached hereto as Exhibit A and incorporated by reference in its entirety.

17. After receiving the Letter Agreement, DSI continued to use and pay for Garnet's services as it had been doing, in all respects consistently with the course of conduct between the parties and the corresponding terms memorialized in the Letter Agreement.

**Count I: Breach of Contract (DSI)**

1-17. Paragraphs 1 through 17 of the Common Allegations are realleged and incorporated by reference as Paragraphs 1 through 17 of this Count I.

18. By its conduct following receipt of the Letter Agreement, including without limitation its continuation in the course of performance consistent with both past practices and the substantive terms of the Letter Agreement, DSI manifested its acceptance of the terms stated in the Letter Agreement.

19. On the strength of Garnet's work, an application was submitted on behalf of DSI client Capital Bancorp that resulted in a refund of approximately $44,492. On or about January 30, 2012, consistent with the course of performance up to that time, Mr. Sol of DSI requested Garnet's invoice for services in connection with the Capital Bancorp application.

20. On or about February 12, 2012, in response to DSI's request and consistent with the course of performance up that that time, Garnet sent DSI its invoice for $2,234.60 for its work on the Capital Bancorp application, representing 20% of the portion of that refund due to DSI.

21. On or about March 26, 2012, in response to reminders from Garnet, DSI advised Garnet that the check on the Capital Bancorp invoices would be sent "right away."

22. On March 28, 2012, for the first time in the course of dealings between the parties, and after Garnet had performed and DSI had paid Garnet for performing work in support of more than forty excise tax refund applications, Mr. Lundy requested "detail" consisting of hours worked on the Capital Bancorp application.

23. On March 29, 2012, for the first time in the course of dealings between the parties, and notwithstanding the fact that Garnet had prepared invoices in accordance with DSI's express instructions up to that time, Mr. Lundy again emailed Ms. Plude to advise that he had been looking at "records of your [Garnet's] past invoices" and requested detail of work hours associated with each invoice.

24. In response to these requests, Ms. Plude repeatedly attempted to reach Mr. Lundy to discuss his questions. Mr. Lundy did not respond to these attempts, but instead sent Ms. Plude an email on April 3, 2012, instructing Garnet to stop work on DSI projects and demanding all "materials," "work product" and "invoices for your hours for each client."

25. On April 5 and again on April 24, 2012, Ms. Plude responded to Mr. Lundy's requests by providing sufficient detail for time devoted to DSI client matters by Garnet staff and principals to demonstrate that in every instance, the value of time worked met or exceeded the level necessary to trigger the 20% fee cap.

26. In a letter dated May 4, 2012, an attorney purporting to speak for DSI challenged the existence, terms and course of performance of the agreement between the parties, in all respects for the first time in the course of dealings between the parties:

(a) The letter purported to express DSI's ignorance of any writing memorializing the terms of the parties' agreement, stating that "you make reference to a contract" and requesting, "[i]f you are in possession of a mutually executed agreement, please provide it so that I can review it with my client."

(b) The letter purported to express DSI's "surprise" at the involvement of, and charges for, individuals named in the detailed information provided by Garnet, including individuals whom DSI had identified to its clients as members of the "project team" for DSI while working with Garnet.

(c) The letter purported to express DSI's "surprise" at billing rates of $250 and $500 for staff and principals working on DSI projects, the rates stated in the Letter Agreement.

(d) The letter acknowledged that the agreement of the parties incorporated "the 20% fee cap" but simultaneously asserted that there was "*no correlation* between the complexity of each matter and the amount of recovery" (emphasis added), while purporting to require an explanation of why "the recovery in each matter is *so closely correlated* to the amount of hours billed" (emphasis added).

(e) The letter stated that the concerns it listed were "not exhaustive" and DSI "does not waive the right to identify additional discrepancies and issues in the future."

27. As of the date of this Complaint, DSI has stopped providing Garnet with information about the status of pending refund applications, payments of refunds on

which Garnet would be entitled to compensation, or the status of refund applications that are being or will be submitted on the strength of Garnet's work product.

28. As of the date of this Complaint, Garnet has provided services to DSI in support of at least five refund claims, for Capital Bancorp LTD, Dominion Resources Services, Inc., O'Neal Steel, Inc., Steelcase, and Swift Transportation, that have been submitted to the IRS and have resulted in refunds to the DSI clients. On information and belief, those clients have in turn paid DSI, and the fee due to Garnet in accordance with its agreement with DSI is up to 20% of those amounts, or $86,705.60. As of the date of this Complaint, DSI has failed to pay Garnet anything for work on the Capital Bancorp LTD matter, and has failed even to acknowledge receipt of payment on the other matters.

29. As of the date of this Complaint, Garnet has provided services to DSI in support of two refund claims, for Kohl's Corporation and US Bancorp, that are fully submitted and that Garnet believes have been approved for payment by the IRS. On information and belief, these refunds will be paid to DSI's clients in the near future or may already have been paid. The fee due to Garnet in accordance with its agreement with DSI will be up to 20% of the amounts paid on those refunds to DSI, or $283,750. As of the date of this Complaint, DSI is not providing Garnet with information on the status of these matters.

30. As of the date of this Complaint, Garnet has provided services to DSI in support of over thirty other refund claims that have been or will be submitted to the IRS. To the extent these claims result in refunds to the DSI clients and payments to DSI, Garnet would be entitled to payment of up to 20% of the amounts that should be

received by DSI. The amount of such payments to Garnet is reasonably estimated at $570,221.90.

31. By directing Garnet to suspend work on excise tax refund work in progress, and by cutting Garnet off from information about the status of pending applications and the opportunity to work with the clients and the IRS to support the applications, DSI has prevented and is preventing Garnet from performing services it is ready and willing to provide, and from assisting in the realization of refunds that would benefit both DSI and Garnet, particularly with respect to the larger accounts that provide Garnet much of the economic value of the contract as a whole.

32. By virtue of the foregoing, DSI is in breach of its obligation to pay Garnet in accordance with the parties' agreement as to those refund claims that have resulted in payments to DSI.

33. By virtue of the foregoing, as to those refund claims that have not yet resulted in payments to DSI, DSI has repudiated its duty under the terms of its agreement with DSI before the time of performance has arrived.

34. Garnet has been damaged and deprived of the benefit of its bargain by DSI's breaches of contract, DSI's anticipatory repudiation of contractual obligations, and DSI's prevention of Garnet's performance.

**Count II: Breach of Covenant of Good Faith and Fair Dealing (DSI)**

1-34. Paragraphs 1-34 of Count I are realleged and incorporated by reference as Paragraphs 1-34 of this Count II.

35. DSI has failed to deal fairly and in good faith with Garnet in at least the following respects:

(a) By unilaterally departing, without justification, from the established practice of paying Garnet 20% of amounts paid to DSI due to excise tax refunds obtained by DSI's clients on the strength of Garnet's work;

(b) By making demands and objections regarding Garnet's staffing and charges that are at variance with the consistent practice established by the parties' course of dealings over approximately four years;

(c) By questioning the very existence of a contract between the parties;

(d) By purporting to suspend Garnet's participation when significant additional refund claims based on Garnet's work are pending before the IRS or will be submitted to the IRS, with the apparent intent of depriving Garnet of its share of the resulting refund payments;

(e) By raising pretextual and baseless objections to Garnet's staffing and invoicing practices even though DSI personnel are well aware of the extensive and significant effort Garnet has devoted to the excise tax refund work;

(f) By refusing even to engage in discussions about the parties' relationship despite requests to do so;

(g) By preventing Garnet from performing further work in support of excise tax refund applications that, if successful, would entitle Garnet to compensation; and

(h) By accepting Garnet's services, and demanding the benefit of Garnet's work product, despite apparently deciding not to pay for them, and despite being aware of Garnet's expectations concerning payment for services consistent with the course of performance between the parties as memorialized in the Letter Agreement;

(i) By purporting to suspend Garnet's participation just as Garnet is completing or has completed work on the larger applications that provide Garnet with a significant share of the contract's value.

36. By virtue of the foregoing breaches of the covenant of good faith and fair dealing, DSI has caused damages to Garnet in an amount to be proven at trial.

**Count III: Promissory Estoppel (DSI)**

1-34. Paragraphs 1-34 of Count I are realleged and incorporated by reference as Paragraphs 1-34 of this Count III.

35. DSI made a clear and definite promise, confirmed and reconfirmed by its actions over a period of years, to pay Garnet up to 20% of money received by DSI on excise tax refunds received by DSI's clients with the support of Garnet's work.

36. DSI made a clear and definite promise that it would pursue progressively larger applications in order to build on early successes in smaller matters and deliver fees to Garnet that would make its efforts worthwhile.

37. Garnet reasonably relied on DSI's promise to pay and to pursue larger accounts, and DSI could reasonably have expected Garnet to do so, in continuing to perform in connection with smaller applications in the expectation of larger applications, and in continuing to perform substantial activities in support of those excise tax applications on which DSI has been paid but has not yet paid Garnet, and which are now pending before the IRS and expected to result in refunds that would entitle Garnet to payments.

38. DSI's promises, its long-term conduct consistent with those promises, and its failure to dispute the Letter Agreement's memorialization of those promises, all

induced Garnet to perform and continue performing substantial activities in support of excise tax applications.

39. Garnet contends that DSI's acts and omissions are actionable on theories of breach of contract and breach of the contractual covenant of good faith and fair dealing as alleged in Counts I and II above, but if for any reason those theories fail, injustice can be avoided only by enforcement of DSI's promise to pay on the terms set forth above.

**Count IV: Quantum Meruit (Unjust Enrichment) (DSI)**

1-34. Paragraphs 1-34 of Count I are realleged and incorporated by reference as Paragraphs 1-34 of this Count IV.

35. DSI has received a benefit from Garnet in the form of substantial services in support of excise tax refund applications that have resulted and continue to result in substantial payments to DSI.

36. As to the applications listed in Paragraphs 28 and 29 above, DSI has been unjustly enriched to the extent it has received and retained the benefits of payments from its clients without compensating Garnet for its efforts in support of those applications.

37. As to the applications described in Paragraphs 29 and 30 above, DSI is or will be unjustly enriched to the extent it receives or has received, and to the extent it retains or has retained, the benefits of payments from its clients without compensating Garnet for its efforts in support of those applications.

38. The failure of DSI to compensate Garnet for the foregoing benefits is to the detriment of Garnet.

### Count V: Negligent Misrepresentation (DSI)

1-34. Paragraphs 1-34 of Count I are realleged and incorporated by reference as Paragraphs 1-34 of this Count V.

35. On information and belief, DSI and its officers, agents and employees were aware that Garnet understood and expected to be compensated for its work in support of excise tax refund applications on the basis alleged above, and had such awareness no later than the date of the Letter Agreement stating Garnet's understanding and expectation in those respects.

36. To the extent DSI did not accept that the parties' agreement was as memorialized in the Letter Agreement, DSI had a duty to speak to inform Garnet of its position and to avoid the foreseeable harm of Garnet continuing to provide valuable services in reliance on its understanding and at risk of not being compensated for its services.

37. In breach of the foregoing duty, DSI negligently misrepresented its position by failing to speak when it had a duty to do so, and by continuing to seek and receive services from Garnet.

38. Garnet has been and continues to be damaged by DSI's negligent misrepresentation.

### Count VI: Fraud (DSI, Lundy, Sol)

1-34. Paragraphs 1-34 of Count I are realleged and incorporated by reference as Paragraphs 1-34 of this Count VI.

35-36. Paragraphs 35 and 36 of Count V are realleged and incorporated by reference as Paragraphs 35 and 36 of this Count VI.

37. By virtue of their awareness of Garnet's understanding of the terms of the parties' agreement, and Garnet's continuing reliance on that understanding in continuing to perform services of value, the silence of DSI, and of individual defendants Lundy and Sol, was a material omission that made their statements concerning the ongoing business dealings between the parties false statements of fact, and DSI and individual defendants Lundy and Sol intended to induce Garnet to rely on such false statements.

38. Without limiting the generality of the foregoing, Mr. Lundy and Mr. Sol expressly misrepresented their intentions and the intentions of DSI in a series of discussions in May and June 2009, in which Mr. Plude expressed concern that the applications to date largely consisted of smaller claims that did not yield fees commensurate with the effort required to process and prepare them.

    a. Throughout these conversations, Mr. Lundy repeatedly assured Mr. Plude that he planned to develop a record of success that his sales staff could use for referrals for the larger clients Mr. Lundy called "whales." Mr. Lundy further assured Mr. Plude that the time expended on smaller clients would pay off as the client base evolved toward the larger, more profitable "whales."

    b. In further response to Mr. Plude's concerns, Mr. Sol sent Mr. Plude an email on June 22, 2009, listing recent sales successes in lining up numerous accounts with expected refund potential over $500,000, $1,000,000, and even one account expected to yield a refund as much as $2,000,000.

39. On information and belief, Mr. Lundy and Mr. Sol intended that Garnet would rely on the expectation of larger payments for future work, but their

representations were false when made because they and DSI intended to do just what they have now done: having induced Garnet to continue working and to provide the foundation for substantial excise tax refunds, they have interposed pretextual rationalizations to bar Garnet from further involvement and to deny Garnet the agreed share of refunds received as a result of Garnet's efforts.

40. Garnet relied to its injury on the foregoing false representations and material omissions.

### Count VII: Unfair Trade Practices (Conn. Gen. Stat. § 42-110) (DSI)

1-40. Paragraphs 1-40 of Count VI are realleged and incorporated by reference as Paragraphs 1-40 of this Count VII.

41. In all respects alleged in this Complaint, DSI was and is engaged in trade or commerce.

42. The foregoing acts and omissions of DSI were and are unfair or deceptive acts or practices in the conduct of trade or commerce.

43. Garnet has suffered and continues to suffer ascertainable losses, and has received something other than what it bargained for, as a result of the acts, omissions and practices of DSI as alleged in this Complaint.

44. By allowing Garnet to proceed in reliance on its understanding concerning the business terms governing its relationship with DSI, particularly after being expressly informed of Garnet's understanding in the Letter Agreement but permitting Garnet to continue performing without comment, DSI's actions reflect a reckless indifference to Garnet's rights or intentional and wanton violation of those rights.

WHEREFORE THE PLAINTIFF CLAIMS DAMAGES AS FOLLOWS:

On Count I: damages.

On Count II: damages.

On Count III: damages.

On Count IV: restitution of the benefit conferred on DSI.

On Count V: damages.

On Count VI: damages, punitive damages and attorneys' fees.

On Count VII: damages, punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a), and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g(d).

On all Counts: such other and further relief at law or equity as may be appropriate.

                          The Plaintiff,
                          Garnet Analytics, Inc.

By: _____
     Christopher P. McCormack (ct 03251)
     T. Scott Cowperthwait (ct 26813)
     Pullman & Comley, LLC
     850 Main Street, P.O. Box 7006
     Bridgeport, CT 06601-7006
     Telephone 203 330 2000
     Facsimile 203 576 8888
     Its Attorneys