UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARNET ANALYTICS, INC. )<br><br>Plaintiff, )<br><br>vs. )<br><br>DIVERSIFIED SOLUTIONS, INC., MICHAEL )<br>LUNDY AND BRIAN SOL )<br><br>Defendants. ) | CIVIL ACTION<br>NO. 3:12-cv-00716 (WWE)<br><br>July 2, 2012 |

### MEMORANDUM OF LAW IN SUPPORT OF
### APPLICATION FOR PREJUDGMENT REMEDY

**I.      INTRODUCTION**

Plaintiff Garnet Analytics, Inc. ("GAI"), submits this Memorandum of Law in support of its Application for Prejudgment Remedy over the real and personal property of Defendants Diversified Solutions, Inc. ("DSI"), Michael Lundy and Brian Sol in the amount of $1,932,068.65. For the reasons that follow, there is ample ground to conclude that GAI has asserted claims for which there is probable cause sufficient to justify a prejudgment remedy on the defendants' assets.

**II.     BACKGROUND**

**A.      Introduction and Overview**

This action involves GAI's provision of services to prepare and support federal telephone excise tax refund (TETR) applications on behalf of certain third-party DSI clients. Those clients paid DSI a percentage of their refunds on successful applications. DSI in turn agreed to compensate GAI for services on an hourly basis, subject to a cap

of 20% of the amounts DSI received from its clients. For approximately three years and more than forty TETR applications, DSI consistently paid GAI on this basis.

In March 2012, however, just as DSI was about to receive significant payments on successful refund applications, DSI suddenly began raising questions it had never before raised about GAI's billing and performance. This sudden deviation from a long-settled course of performance swiftly culminated in DSI's instruction to GAI to stop all work in process and return work papers to DSI.

When GAI commenced this action, DSI had already failed and refused to pay anything on certain outstanding GAI bills. Since then, DSI has received other payments from its clients, triggering the obligation to pay GAI fees that DSI has failed and refused to pay. Numerous other applications submitted on the basis of GAI's completed work are pending before the United States Internal Revenue Service ("IRS") and are expected to result in refunds; GAI has been paid nothing to date for services in connection with those applications but, in accordance with the underlying agreement with DSI, will be entitled to payment for its services when the refunds are paid and the clients pay DSI.

As detailed below, the actions of DSI are clearly in breach of contract, so there is probable cause to order a prejudgment remedy on that theory alone. GAI contends, however, that the sequence of events manifests a deliberate effort by DSI to deprive GAI of compensation for work that has benefited and continues to benefit DSI, so probable cause exists as to all of GAI's claims.

Details of the foregoing activities, agreements and events are more fully alleged in GAI's Complaint (May 14, 2012), which GAI's President Denise Plude has verified in

-2-

support of this prejudgment remedy application.  See Affidavit of Denise Plude (Exhibit A) at ¶¶ 2-3 and Exhibit 1 (copy of Complaint).  The following chronology provides key events and facts common to all of GAI's claims; additional facts relevant to specific substantive liability theories and damages will be discussed in the corresponding sections of this Memorandum concerning the probable cause standard.

### B.  Excise Tax Refund Activities

Beginning in 2008 and continuing to the present, at DSI's request, GAI agreed to provide analytical services to DSI, and to prepare tax studies and Internal Revenue Service tax forms for DSI clients in support of the clients' telephone excise tax refund claims, and DSI agreed to compensate GAI for doing so.  Complaint ¶ 7.  DSI's business included technical consulting services concerning telephone systems for major businesses, so it had access to entities with the potential to make significant TETR applications, but DSI itself entirely lacked the data analysis and tax preparation expertise to work with the businesses or prepare the applications.  D. Plude Affidavit (Exh. A) at ¶¶ 4-11.  DSI therefore initiated contact with Michael Plude, husband of Denise Plude and a principal in the Connecticut accounting firm Kaskie Plude and Company, LLC ("Kaskie Plude"), to engage him, but because much of the work was data analysis rather than accounting, DSI ended up working primarily with GAI President Denise Plude, who has extensive experience in sophisticated statistical data analysis, and who ultimately took a significant role in negotiations on TETR applications with the IRS.  Affidavit of Michael S. Plude (Exhibit B), ¶¶ 4-9; D. Plude Affidavit (Exh. A) at ¶ 12.

-3-

GAI's services included participating with DSI personnel as part of DSI "client teams" working with DSI clients to prepare TETR applications, with DSI personnel serving as liaison with the clients but GAI performing all substantive data analysis, tax study and tax form preparation.  GAI's services involved identifying, reviewing and analyzing DSI clients' records in support of excise tax refund claims.  GAI prepared audit-ready binders of documents and supporting material and delivered them to DSI clients for submission to the IRS.  Most importantly, GAI was instrumental in conferring with IRS staff to explain and support the methodology GAI employed to document refund claims.  Complaint ¶ 8.  DSI personnel lacked the competencies in data analysis and tax form preparation necessary to perform these tasks.  D. Plude Affidavit (Exh. A) ¶¶ 8-10.

In performing the foregoing services, GAI refined certain statistical methods to analyze client records and develop support for excise tax refund claims.  Through conferences with IRS staff, GAI, and particularly GAI's principal and president, Denise Plude, convinced IRS staff of the reliability of GAI's statistical sampling methods, and developed a level of rapport and credibility that materially enhanced efforts to obtain excise tax refunds.  Complaint ¶ 9.

In performing services for DSI, GAI made use of employees of Kaskie Plude, whose time on GAI work was tracked by time and billing software and treated as chargeable to GAI.  GAI from time to time paid Kaskie Plude for such time, subject to final adjustment of accounts when work on all TETR applications was complete and all amounts due GAI from DSI had been received.  DSI was aware of the involvement of

-4-

Kaskie Plude employees and regularly identified them as part of the DSI "project team" in communications with DSI's clients.  Complaint ¶ 10.

### C.    Compensation of GAI; Course of Performance re Billing and Payment

DSI receives a portion of its clients' excise tax refunds as compensation for activities in support of TETR applications.  Complaint ¶ 11.  As compensation for GAI's services, DSI agreed to pay GAI, and until March 2012 did pay, a fee calculated by reference to the hours devoted by "principals" and "staff" to excise tax matters, subject to a cap of 20% of the fee DSI's clients paid DSI.  The 80/20 split was based on DSI's representations that it would employ highly qualified sales staff to develop clients with substantial refund claims that would be profitable to GAI at the 80/20 level.  DSI staff referred to clients with such larger refund claims as "whales."  Complaint ¶ 12; see also M. Plude Affidavit (Exh. B) ¶¶ 5-9 (contact initiated by DSI, negotiation of terms).

In May and June 2009, in a series of conversations, Michael Plude expressed concern that many of the refund applications involved small amounts that did not generate fee income commensurate with effort.  DSI President Michael Lundy reaffirmed that experience to date would provide a foundation of positive referrals that would enable DSI's sales staff to develop engagements with the "whales" that would make the arrangement profitable for GAI.  Complaint ¶ 13.

In practice, DSI did not require GAI to provide detail of hours worked by individual staff and principals, but routinely notified GAI of the amount of taxes and interest refunded to DSI's clients, and DSI routinely instructed GAI to render invoices in specific amounts equal to 20% of the total paid to DSI.  In practice, the time devoted to the excise tax refund applications by staff and principals working on behalf of GAI

-5-

consistently exceeded the 20% cap, such that the fees charged by GAI and paid by DSI would have been capped at 20% of the amount received by DSI even if DSI had requested detail as to hours worked.  Complaint ¶ 14; see also D. Plude Affidavit (Exh. A) ¶¶ 13-15 (GAI hourly fees in excess of 20% cap).  The foregoing practices, including DSI's routine payment to GAI of 20% of client payments to DSI, continued without interruption until late March 2012.  Over that period, GAI worked with DSI on successful excise tax refund claims for over forty DSI clients, on which DSI's clients paid DSI more than $2.8 million.  Over that period, DSI consistently paid the agreed 20% of its fees to GAI, amounting to over $571,000.  Throughout that period, DSI did not request hourly billing detail from GAI in support of its charges.  Complaint ¶ 15.

**D.    April 2010 Letter Agreement and Continued Course of Performance**

In 2009 and 2010, GAI, through its president Denise Plude, exchanged correspondence with DSI about documentation to confirm the terms on which GAI had been and was providing services to DSI.  Among other things, the correspondence expressly confirmed that GAI calculated the value of time spent on DSI client matters at two rates - $250 per hour for staff, and $500 per hour for principals.  On behalf of DSI, both Mr. Lundy and Mr. Sol reviewed the draft letter agreement memorializing these terms.  DSI requested changes that Ms. Plude incorporated before executing it on behalf of GAI as President and returning it to DSI by email on April 23, 2010.  At no time did Mr. Lundy or Mr. Sol dispute that the version of the letter agreement sent to them on April 23, 2010 ("Letter Agreement") accurately stated the agreed terms for GAI to provide services to DSI.  They understood no later than that date that the terms stated in the Letter Agreement expressed GAI's understanding of the agreement between the

-6-

parties and GAI's expectations concerning compensation for its work on behalf of DSI clients. A copy of the Letter Agreement is attached to the Complaint. Complaint ¶ 16.

After receiving the Letter Agreement, DSI continued to use and pay for GAI's services as it had been doing, in all respects consistently with the course of conduct between the parties as outlined above and the corresponding terms memorialized in the Letter Agreement. Complaint ¶ 17.

### E.    DSI's Unilateral Deviation from Agreed Terms and Prior Performance

On the strength of GAI's work, a TETR application was submitted on behalf of DSI client Capital Bancorp that resulted in a refund of approximately $44,492. On or about January 30, 2012, consistent with the course of performance up to that time, Mr. Sol of DSI requested GAI's invoice for services in connection with the Capital Bancorp application.    Complaint ¶ 19.    In response, and consistent with the course of performance up to that time, GAI on February 12, 2012, sent DSI its invoice for $2,234.60 for its work on the Capital Bancorp application, representing 20% of the portion of that refund due to DSI. Complaint ¶ 20. On or about March 26, 2012, DSI advised GAI that the check on the Capital Bancorp invoices would be sent "right away." Complaint ¶ 21.

On March 28, 2012, however, for the first time in the course of dealings between the parties, and after GAI had performed and DSI had paid GAI for performing work in support of more than forty excise tax refund applications, Mr. Lundy requested "detail" consisting of hours worked on the Capital Bancorp application. Complaint ¶ 22.

On March 29, 2012, also for the first time in the course of dealings between the parties, and notwithstanding the fact that up to that time DSI had consistently accepted

and paid GAI invoices prepared in accordance with DSI's express instructions, Mr. Lundy advised Ms. Plude that he had been looking at "records of your [GAI's] past invoices" and requested detail of work hours for each invoice. Complaint ¶ 23.

In response to these requests, Ms. Plude repeatedly attempted to reach Mr. Lundy to discuss his questions. Mr. Lundy did not respond to these attempts, but instead sent Ms. Plude an email on April 3, 2012, instructing GAI to stop work on DSI projects and demanding all "materials," "work product" and "invoices for your hours for each client." Complaint ¶ 24. Ms. Plude provided Mr. Lundy with sufficient detail for time devoted to DSI client matters by GAI staff and principals to demonstrate that in every instance, the value of time worked met or exceeded the level necessary to trigger the 20% fee cap. Complaint ¶ 25.

DSI's next communication to GAI was a letter dated May 4, 2012, from its attorney, comprehensively challenging the existence, terms and course of performance of the agreement between the parties, in all respects for the first time in the course of dealings between the parties. The letter purported to express DSI's ignorance of any writing memorializing the terms of the parties' agreement, stating that "you make reference to a contract" and requesting, "[i]f you are in possession of a mutually executed agreement, please provide it so that I can review it with my client." It purported to express DSI's "surprise" at the involvement of, and charges for, individuals named in the detailed information provided by GAI, even though DSI had identified those very same individuals to DSI's own clients as members of the "project team" on TETR application matters. The letter also purported to express DSI's "surprise" at billing rates of $250 and $500 for staff and principals working on DSI projects, the rates

-8-

stated in the Letter Agreement. While seeming to acknowledge that the agreement of the parties incorporated "the 20% fee cap," the letter simultaneously asserted that there was "no correlation between the complexity of each matter and the amount of recovery," while asking why "the recovery in each matter is so closely correlated to the amount of hours billed." The letter finally stated that the concerns it listed were "not exhaustive" and DSI "does not waive the right to identify additional discrepancies and issues in the future." Complaint ¶ 26.

As of the date of the Complaint, DSI had stopped providing GAI with information about the status of pending refund applications, payments of refunds on which GAI would be entitled to compensation, or the status of refund applications that are being or will be submitted on the strength of GAI's work product. Complaint ¶ 27.

By letter dated June 14, 2012, counsel for DSI provided undersigned counsel for GAI with a letter (copy attached as Exhibit C) purporting to identify seven client payments received by DSI as of June 6, 2012. The amounts of the payments to DSI, with the fees due GAI in accordance with the parties' agreement and the 20% cap, are as follows:

    a.     Capitol Bancorp: $11,173.25. Due GAI: $2,234.65.

    b.     Swift Transportation: $185,648.25. Due GAI: $37,129.65.

    c.     ONeal Steel: $28,102.80. Due GAI: $5,620.56.

    d.     CIT Group: $39,940.75. Due GAI: $7,988.15.

    e.     Rent-A-Center: $236,642.15. Due GAI: $47,328.43.

    f.     Dominion Resources: $102,466.65. Due GAI: $20,493.33.

    g.     US Bank: $1,158.454.23. Due GAI: $231,690.85.

As of the date of this Memorandum, out of the $352,485.62 due to GAI on these amounts DSI admits receiving, DSI has paid GAI nothing for its work on any of the foregoing TETR applications.[1]

At the time of the filing of the Complaint, GAI had provided services to DSI in support of at least five claims that had been submitted to the IRS and had resulted in refunds to the DSI clients.  Although fees are now due GAI, DSI has paid GAI nothing.  Complaint ¶ 28.  At the time of the filing of the Complaint, GAI had provided services to DSI in support of two additional refund claims that GAI believes have been approved for payment by the IRS, and fees will be due when those clients pay DSI, and in support of other refund claims that have been or will be submitted to the IRS.  DSI is not providing GAI with any information on the status of those claims.  Complaint ¶¶ 29-30.  By directing GAI to suspend work and cutting GAI off from information about the status of pending claims and the opportunity to work with the clients and the IRS in support of the applications, DSI has prevented and is preventing GAI from performing services it is ready and willing to provide – particularly with respect to the larger accounts that provide GAI with much of the economic value of the contract as a whole.  Complaint ¶ 31.

## III.    GAI IS ENTITLED TO A PREJUDGMENT REMEDY AGAINST DEFENDANTS

### A.    THERE IS PROBABLE CAUSE FOR GAI'S CLAIMS

GAI is entitled to a prejudgment remedy upon a showing of "probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater

---

[1]    While the letter attached as Exhibit C constitutes an admission that DSI has received *at least* the listed amounts, GAI reserves the right to claim additional amounts if warranted in light of further discovery and production of documents concerning refunds actually received by DSI clients and payments actually received by DSI.

than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of [GAI]." Conn. Gen. Stat. § 52-278d(a).

The probable cause determination does not entail a "full scale trial on the merits." Three S. Development Co. v. Santore, 193 Conn. 174, 175 (1984). Rather, the trial court must simply "determine probable success by weighing probabilities." Calfee v. Usman, 224 Conn. 29, 37 (1992). The moving party need not demonstrate beyond a reasonable doubt that it will triumph, "only that there is probable cause to sustain the validity of the claim." Ledgebrook Condominium Assn., Inc. v. Lusk Corp., 172 Conn. 577, 584 (1977).

It is well settled that probable cause is a "bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstance, in entertaining [the action]." New England Land Co. v. DeMarkey, 213 Conn. 612, 620 (1990) (quoting Wall v. Toomey, 52 Conn. 35, 36 (1884)). Probable cause is a flexible common sense standard that does not require the "bona fide belief" to be correct or more likely true than false. Orsini v. Tarro, 80 Conn. App. 268, 272 (2003); Schrage v. Israel, Connecticut Superior Court, Docket No. CV4006596, 2008 WL 808614 (Adams, J., March 7, 2008)[2]; cf. Hoke, Inc. v. Circuits, Inc., 26 Conn. App. 804, 805 (1992) (denial of prejudgment remedy erroneous where court stated it did not have enough evidence to "enter a judgment"). See also Qualitative Reasoning Sys., Inc. v. Computer Scis.

---

[2]   Copies of all unreported cases cited herein have been attached hereto in alphabetical order as Exhibit D.

Corp., No. 3:98 CV 554 AWT, 2000 WL 852127, at *10 (D. Conn. Mar. 31, 2000) (restating Connecticut law on probable cause standard for prejudgment remedy).

Even a "very brief" affidavit submitted by a party moving for prejudgment remedy can be enough to satisfy the probable cause standard. See Doe v. Rapoport, 80 Conn. App. 111, 117 (2003). A party moving for prejudgment remedy need only meet the probable cause standard for a single count of its complaint to warrant a grant of prejudgment remedy. See Stone v. Frederick Hobby Associates II, Connecticut Superior Court, Docket No. CV000181620, 2001 WL 861822 at *23 (Mintz, J., July 10, 2001). Probable cause may exist even though a "different result might well ensue" following "discovery and a full hearing on the merits." Pitney Bowes Credit Corp. v. Escotel Software, Inc., Connecticut Superior Court, Docket No. CV010183438, 2002 WL 451015 (Lewis, J., Mar. 7, 2002).

Measured by these principles, GAI has more than shown the probable cause necessary to justify a prejudgment remedy in its favor, not merely on one Count of its Complaint, but on all Counts.

### 1.    Probable Cause as to Breach of Contract (Count I)

GAI has shown that the parties performed over a period of nearly three years consistent with a fundamental understanding that GAI's fees would be determined at hourly rates of $250 for "staff" and $500 for "principals," and capped at 20% of payments to DSI from its clients. DSI was familiar with the significant work GAI performed on the TETR applications and routinely instructed GAI to render invoices equal to the 20% cap, without requesting any backup of hours worked.

This course of performance, without more, establishes an enforceable contract. An implied contract "requires that (1) [the plaintiff] rendered services under circumstances indicating that [it] expected to be paid therefor, and (2) the defendant, knowing such circumstances, availed [itself] of the benefit of those services." Bourret v. Miller, Connecticut Superior Court, Docket No. CV075002152, 2008 WL 2502563 (Jones, J., June 5, 2008). "An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573-74, 898 A.2d 178, 190 (2006).

GAI has also shown that the Letter Agreement constitutes an enforceable express contract. DSI clearly received the Letter Agreement, clearly understood that it articulated the rights and obligations of the parties, and clearly continued to do business with GAI and reap the benefits of GAI's work. Measured by a probable cause standard, this constitutes DSI's acceptance by conduct of the business terms set forth in the Letter Agreement.

> The law . . . does not require an express acceptance. Acceptance may be shown by acts or conduct indicating assent to an offer or, under appropriate circumstances, acceptance may be implied by the offeree's silence and inaction. Moreover, regardless of actual intent, if the offeree's conduct leads the offeror reasonably to conclude that the offer is being accepted, acceptance has taken place as a matter of law.

> Pleines v. Franklin Const. Co., Inc., 30 Conn. App. 612, 617 (1993).

Whether the contract between the parties is implied or express, DSI is in breach by virtue of having failed and refused to pay GAI on outstanding invoices and on those accounts for which DSI itself has received payments from its clients but has paid GAI nothing. In all such instances, GAI has fully performed its obligations. "The elements of

a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Keller v. Backenstein, 117 Conn.App. 550, 558, cert. denied, 294 Conn. 913 (2009).

DSI is further in breach by virtue of its statements and conduct constituting anticipatory repudiation and prevention of performance by GAI. DSI has brazenly stated its intent to deprive GAI of compensation for extensive work on numerous TETR applications now pending before the IRS and likely to result in refunds and payments to DSI. Those refunds and payments literally would not exist without the support GAI has provided. DSI's positive statement that it will not perform its contract constitutes an anticipatory repudiation, which is a total breach of contract. Martin v. Kavanewsky, 157 Conn. 514, 518-19 (1969). DSI has moreover clearly taken steps to shut GAI out of the application and review process. GAI's expertise and credibility with IRS staff are crucial to the success of these applications, so DSI's actions materially reduce the likelihood of refund payments that would trigger GAI's right to compensation. "[I]n order to amount to a prevention of performance by the adversary party, the conduct on the part of the party who is alleged to have prevented performance must be wrongful, and, accordingly, in excess of his legal rights." Godburn v. Meserve, 130 Conn. 723, 726 (1944).

### 2.     Probable Cause as to Breach of Covenant of Good Faith (Count II)

The requirements for pleading a breach of the covenant of good faith and fair dealing under Connecticut law are well-established. '[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ... The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term ... To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.'

Renaissance Management Co., Inc. v. Connecticut Housing Finance Authority, 281 Conn. 227, 240 (2007). '[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing.' Macomber v. Travelers Property and Casualty Corp., 261 Conn. 620, 638 (2002).

As the Connecticut Supreme Court has explained, "[g]ood faith and fair dealing means an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking means faithful[ness] to one's duty or obligation ... [B]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties ... [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity[;] ... it contemplates a state of mind affirmatively operating with furtive design or ill will.' Buckman v. People Express, Inc., 205 Conn. 166, 171 (1987).

Ensign Yachts, Inc. v. Arrigoni, Docket No. 3:09-CV-209 (VLB), 2010 WL 918107

(D. Conn. Mar. 11, 2010); reconsideration denied, 2010 WL 2976927 (D. Conn. July 23,

2010) (VLB).

There is probable cause to conclude that DSI has failed to deal fairly and in good

faith with GAI in numerous respects:

(a)     By unilaterally departing, without justification, from the established practice

of paying GAI 20% of amounts paid to DSI on excise tax refunds obtained by DSI's

clients on the strength of GAI's work;

(b)     By making demands and objections regarding GAI's staffing and charges

that are at variance with the consistent practice established by the parties' course of

dealings over approximately four years;

(c)     By questioning the very existence of a contract between the parties on the

transparently pretextual basis of whether a written document DSI accepted by conduct

and without protest is "fully executed";

-15-

(d)     By purporting to suspend GAI's participation when significant additional refund claims based on GAI's work are pending before the IRS or will be submitted to the IRS on the basis of GAI's work, with the apparent intent of depriving GAI of its share of the resulting refund payments;

(e)     By raising pretextual and baseless objections to GAI's staffing and invoicing practices even though DSI personnel are well aware of the extensive and significant effort GAI has devoted to the excise tax refund work;

(f)     By refusing even to engage in discussions about the parties' relationship despite requests to do so;

(g)     By preventing GAI from performing further work in support of excise tax refund applications that, if successful, would entitle GAI to compensation;

(h)     By accepting GAI's services, and demanding the benefit of GAI's work product, despite apparently deciding not to pay for them, and despite being aware of GAI's expectations concerning payment for services consistent with the course of performance between the parties as memorialized in the Letter Agreement; and

(i)     By purporting to suspend GAI participation just as GAI is completing or has completed work on the larger applications that provide GAI with a significant share of the contract's value.

In terms of the probable cause standard by which these matters must be viewed here, it is also relevant that this is apparently not the first time DSI has provoked claims by a financial services provider with which it contracted to support excise tax refund applications.  See M. Plude Affidavit (Exh. B), ¶ 24 and Exhibits 4, 5 and 6 to same (2010 California lawsuit against DSI by accounting firm for breach of contract and

related claims arising out of agreement concerning excise tax refund applications). From all appearances, DSI and its principals have not merely dealt unfairly and bad faith with GAI: it is apparently their ordinary business practice to do so. This apparent pattern further confirms the conclusion that a person of ordinary caution, prudence and judgment would entertain an action against DSI and its principals for breach of the covenant of good faith and fair dealing.

### 3.    Probable Cause as to Promissory Estoppel (Count III)

This court has recognized . . . the development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor.... Section 90 of the Restatement [(Second) of Contracts] states that under the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. [1 Restatement (Second), Contracts § 90, p. 242 (1981).] A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all.

Stewart v. Cendant Mobility Services Corp., 267 Conn. 96, 104-05 (2003)

(Citations omitted; internal quotation marks omitted.).

DSI made a clear and definite promise, confirmed and reconfirmed by its actions over a period of years, to pay GAI up to 20% of money received by DSI on excise tax refunds received by DSI's clients with the support of GAI's work.

DSI made a clear and definite promise that it would pursue progressively larger applications in order to build on early successes in smaller matters and deliver fees to GAI that would make its efforts worthwhile.

-17-

GAI reasonably relied on DSI's promises to pay and to pursue larger accounts, and DSI could reasonably have expected GAI to do so, in continuing to perform in connection with unprofitable smaller applications in the expectation of larger applications, and in continuing to perform substantial activities in support of those excise tax applications on which DSI has been paid but has not yet paid GAI, and which are now pending before the IRS and expected to result in refunds that would entitle GAI to payments.

DSI's promises, its conduct consistent with those promises over the entire period from 2008 to early 2012, and its failure to dispute the Letter Agreement's memorialization of those promises, all induced GAI to perform and continue performing substantial activities in support of excise tax applications.

Independent of the foregoing theories of breach of contract and breach of the covenant of good faith and fair dealing, there is probable cause to conclude that injustice can be avoided only by enforcement of DSI's promise to pay on the terms set forth above and in the Letter Agreement.

### 4.    Probable Cause as to Quantum Meruit (Count IV)

Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact. Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement. Quantum meruit literally means " 'as much as he has deserved'...." Black's Law Dictionary (7th Ed.1999). Centered on the prevention of injustice, quantum meruit strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services.

Gagne v. Vaccaro, 255 Conn. 390, 401 (2001).

DSI has received a benefit from GAI in the form of substantial services in support of excise tax refund applications that have resulted and continue to result in substantial

-18-

payments to DSI.  As to those applications that have already resulted in payments to DSI, DSI has been unjustly enriched to the extent it has received and retained the benefits of payments from its clients without compensating GAI for its efforts in support of those applications.  As to those applications that have been and will be submitted to the IRS in reliance on GAI's work, DSI is or will be unjustly enriched to the extent it receives or has received, and to the extent it retains or has retained, the benefits of payments from its clients without compensating GAI for its efforts in support of those applications.  The failure of DSI to compensate GAI for the foregoing benefits is to the detriment of GAI.

### 5.    Probable Cause as to Negligent Misrepresentation (Count V)

This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.... The governing principles [of negligent misrepresentation] are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining the information, or communicating the information.

Williams Ford, Inc. v. Hartford Courant Co., supra, 232 Conn. 559, 575 (1995)

(Citations omitted; internal quotation marks omitted.).

Liability for negligent misrepresentation may arise from failure to speak when there has been

a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak.... Such a duty is imposed on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make full and fair disclosure as to the matters about which he assumes to speak.

Johnnycake Mountain Associates v. Ochs, 104 Conn. App. 194, 206 (2007).

DSI and its officers, agents and employees were aware that GAI understood and expected to be compensated for its work in support of excise tax refund applications on the basis alleged above, and had such awareness no later than the date of the Letter Agreement stating GAI's understanding and expectation in those respects.

If DSI did not accept that the parties' agreement was as memorialized in the Letter Agreement, DSI had a duty to speak to inform GAI of its position and to avoid the foreseeable harm of GAI continuing to provide valuable services in reliance on its understanding and at risk of not being compensated for its services. In breach of that duty, DSI negligently misrepresented its position by failing to speak when it had a duty to do so, and by continuing to seek and receive services from GAI.

GAI has been and continues to be damaged by DSI's negligent misrepresentation.

### 6. Probable Cause as to Fraud (Count VI)

"[T]he essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Garrigus v. Viarengo, 112 Conn. App. 655, 663-64 (2009).

By virtue of their awareness of GAI's understanding of the terms of the parties' agreement, and GAI's continuing reliance on that understanding in continuing to perform services of value, all as discussed above with respect to Count V, the silence of DSI and of individual defendants Lundy and Sol, was a material omission that made their statements concerning the ongoing business dealings between the parties false

statements of fact, and DSI and individual defendants Lundy and Sol intended to induce GAI to rely on such false statements.  Complaint ¶ 37.

Without limiting the generality of the foregoing, Mr. Lundy and Mr. Sol individually and as agents of DSI expressly misrepresented their intentions and the intentions of DSI in a series of discussions in May and June 2009, in which Mr. Plude expressed concern that the applications to date largely consisted of smaller claims that did not yield fees commensurate with the effort required to process and prepare them.  See generally Complaint ¶ 38.  Specifically:

a.      Throughout these conversations, Mr. Lundy repeatedly assured Mr. Plude that he planned to develop a record of success that his sales staff could use for referrals for the larger clients Mr. Lundy called "whales."  Mr. Lundy further assured Mr. Plude that the time expended on smaller clients would pay off as the client base evolved toward the larger, more profitable "whales."

b.      In further response to Mr. Plude's concerns, Mr. Sol sent Mr. Plude an email on June 22, 2009, listing recent sales successes in lining up numerous accounts with expected refund potential over $500,000, $1,000,000, and even one account expected to yield a refund as much as $2,000,000.

Mr. Lundy and Mr. Sol plainly intended that GAI would rely on the expectation of larger payments for future work, but their representations were false when made because they and DSI intended to do just what they have now done: having induced GAI to continue working and to provide the foundation for substantial excise tax refunds, they have interposed pretextual rationalizations to bar GAI from further involvement and to deny GAI the agreed share of refunds received as a result of GAI's efforts.

Complaint ¶ 39.  Their intent is readily inferred from their actions, in particular their otherwise inexplicable and arbitrary deviation from years of invoicing practice, and from the apparent pattern of luring financial professionals into arrangements to support excise tax refund applications, then evading their obligations.  See M. Plude affidavit (Exh. B) ¶ 24.

Now that DSI, Sol and Lundy have taken the same tack with GAI, it is self-evident that GAI relied to its injury on their false representations and material omissions.

### 7.    Probable Cause as to Unfair Trade Practices (Count VII)

CUTPA provides that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' General Statutes § 42-110b(a). In order to enforce this prohibition, CUTPA provides a private cause of action to '[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice....' General Statutes § 42-110g(a).

Thus, in order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, as a result of' this act, the plaintiff suffered an injury. The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff.  With regard to the requisite causal element, it is axiomatic that proximate cause is [a]n actual cause that is a substantial factor in the resulting harm.   The question to be asked in ascertaining whether proximate cause exists is 'whether the harm which occurred was of the same general nature as the foreseeable risk' created by the defendant's act.

Stevenson Lumber Co.-Suffield, Inc. v. Chase Associates, Inc., 284 Conn. 205, 213-14 (2007) (Citations omitted; Internal quotation marks omitted).

In all respects alleged in GAI's Complaint, DSI was and is engaged in trade or commerce.   The acts and omissions of DSI discussed above were and are unfair or deceptive acts or practices in the conduct of trade or commerce.

GAI has suffered and continues to suffer ascertainable losses, and has received something other than what it bargained for, as a result of the acts, omissions and practices of DSI as alleged in this Complaint. "Whenever a [plaintiff] has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." Hinchliffe v. Am. Motors Corp., 184 Conn. 607, 614 (1981).

By allowing GAI to proceed in reliance on its understanding concerning the business terms governing its relationship with DSI, particularly after being expressly informed of GAI's understanding in the Letter Agreement but permitting GAI to continue performing without comment, DSI's actions reflect a reckless indifference to GAI's rights or intentional and wanton violation of those rights. This supports an award of punitive or exemplary damages under CUTPA. Gargano v. Heyman, 203 Conn. 616, 622 (1987).

## B.    THERE IS REASONABLE BASIS FOR ESTIMATING GAI'S DAMAGES

GAI must show evidence supporting a reasonable basis for the amount of damages sought in a prejudgment remedy. "Although the amount of damages in an application for a prejudgment remedy need not be determined with mathematical precision, Rafferty v. Noto Bros. Construction, LLC, 68 Conn. App. 685, 693 (2002), the record must be sufficient for the court to make a fair and reasonable prediction as to likely damages.  Kendall v. Amster, 108 Conn. App. 319, 331 (2008)."  SS & C Technologies, Inc. v. Providence Inv. Mgmt., 582 F.Supp.2d 255, 258 (D. Conn. 2008). "[T]he plaintiff bears the burden of presenting evidence which affords a reasonable basis for measuring [its] loss." Rafferty v. Noto Bros. Construction, LLC, 68 Conn. App.

685, 693 (2002), *citing* <u>Spera v. Audiotape Corp.</u>, 1 Conn.App. 629, 633 (1984);

<u>Ledgebrook Condominium Assn., Inc. v. Lusk Corp.</u>, 172 Conn. 577, 584-86 (1977).

> In an application for prejudgment remedy, damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate. Facts must be presented which are sufficient to enable the court to determine the probably amount of damages involved. As a matter of general experience, a determination of a claim's probable validity normally will entail at least some consideration of the amount of damages which may be found upon a full trial.

<u>Burkert v. Petrol Plus of Naugatuck, Inc.</u>, 5 Conn. App. 296, 301 (1985).

GAI's actual damages fall into two categories.

The first category consists of those TETR applications GAI has completed but on which GAI has not yet paid. For each such TETR application, when DSI is paid, GAI is entitled to be paid *either* fees determined by multiplying the time spent on the application times the applicable staff or principal hourly rate, *or* 20% of the refund received by the DSI client, whichever is less. The rationale for such payment is that GAI fully performed before DSI purported to terminate the parties' relationship, so any payment received by DSI is subject to the agreed payment terms.

The second category consists of those TETR applications that were in preparation at the time DSI purported to terminate the parties' relationship. For each such application, GAI is entitled to be paid on the same basis because DSI's breach prevented GAI from completing the services that would have resulted in a fully-submitted TETR application.

To the extent TETR applications in the foregoing categories are still pending before the IRS or were incomplete when DSI purported to terminate the parties' relationship, it is both possible and reasonable to estimate the amounts of refunds and

interest that provide the measure of GAI's damages.  As detailed in the affidavits of Michael Plude and Denise Plude attached hereto, GAI's TETR work resulted in a clarification concerning the parameters and requirements by which the IRS determined eligibility.   TETR applications prepared consistent with that clarification have consistently been allowed   in essentially the amounts requested, without material change.   Based on this experience, it can reasonably be estimated that pending completed TETR applications will result in refunds equal to the requested amounts. Because the incomplete unfiled TETR applications were being prepared in accordance with the same clarification, and because they were in an advanced state of preparation at the time DSI purported to terminate the parties' relationship, there is a very high degree of probability that the refunds would have come out close to the estimates if DSI had not prevented GAI from completing them, and the time required for GAI staff and principals to prepare the applications would trigger the agreed 20% fee cap.  See D. Plude Affidavit (Exh. A), ¶¶ 13-15; M. Plude Affidavit (Exh. B), ¶¶ 18-23.[3]

On the foregoing basis, a fair and reasonable estimate of GAI's actual damages is  $1,545,654.92,  consisting  of  $1,068,307.86  for  completed,  pending  TETR applications, and $477,347.06 for TETR applications not fully completed or submitted at the time DSI purported to terminate the parties' relationship.  See M. Plude Affidavit (Exh. B) ¶¶ 10-17 and Exhibits 2 and 3 thereto (calculations and amounts).

These *actual* damages are most obviously recoverable on a simple breach of contract theory, but would form the nucleus of recovery on any of the theories of liability

---

[3]   It is appropriate to include reasonably estimable fees on work in process because DSI's actions constitute anticipatory breach and have prevented GAI from completing its performance and earning the agreed compensation.   See above Section III.A.1.

GAI has asserted. Accordingly, there are multiple justifications for concluding that GAI has made out probable cause for damages reasonably estimable in this amount.

The foregoing calculation assumes that GAI should be compensated in accordance with the agreement of the parties, including the 20% cap. GAI would contend that if it prevails only on its quantum meruit claim (Count IV; see III.A.4. above), the amount due would not be limited by the 20% cap. The amount recoverable on a quantum meruit theory therefore would be in excess of the foregoing total.

GAI has also made out probable cause on common-law and statutory liability theories that would support awards of punitive damages and attorneys' fees. Most obviously, CUTPA provides separately for awards of punitive damages *and* attorneys' fees. Conn. Gen. Stat. § 42-110g(a) (punitive damages may be awarded in discretion of court), § 42-110g(d) (court may award costs and reasonable attorneys' fees "in addition to the relief provided in this section"). Given the suspicious circumstances of DSI's purported termination of the parties' relationship – on the eve of completing the final TETR applications and collecting fees on the "whales" DSI dangled as enticement to induce GAI to continue providing the services necessary to support the applications – GAI respectfully submits that it has established probable cause that it will recover punitive damages in some form.

It would be reasonable to conclude that there is probable cause to estimate punitive damages as a multiple of actual damages, i.e. double or treble. It would also be reasonable to conclude that there is probable cause to estimate attorneys' fees in an amount to be added to actual and other damages. As a conservative surrogate for the various additional amounts that might be awarded in this case as punitive damages or

attorneys' fees, however, GAI proposes to increase the estimated actual damages total by 25%. Because GAI has made out probable cause that it will recover something more than its actual damages, this approach yields a fair and reasonable estimate of the total on which GAI is entitled to security.

On the foregoing basis, GAI respectfully submits that a prejudgment remedy should be granted in this action against defendants DSI, Lundy and Sol in the amount of $1,932,068.65, equal to 125% of its estimated actual damages.

## IV. DEFENDANTS SHOULD BE ORDERED TO BRING ASSETS INTO CONNECTICUT SUFFICIENT TO SATISFY A PREJUDGMENT REMEDY

DSI and the individual defendants reside out of state. While GAI is simultaneously asking the Court to order them to disclose assets, it is obviously possible that such assets will be outside the District. Accordingly, GAI asks the Court to exercise its authority to order these defendants to bring assets into Connecticut sufficient to satisfy the prejudgment remedy and to make them available for attachment.

Case law supports the conclusion that the Court may exercise this authority on the same "probable cause" basis that justifies the award of prejudgment relief under Connecticut law. In the alternative, the Court has the authority to issue a preliminary injunction over parties subject to personal jurisdiction, upon a showing that meets the preliminary injunction standard. In this case, the record supports such an order on either standard.

### A. ORDER ON PREJUDGMENT REMEDY "PROBABLE CAUSE" BASIS

In Lyons Hollis Associates, Inc. v. New Technology Partners, Inc., 278 F. Supp. 2d 236 (D. Conn. 2003) (JBA), the plaintiff sought an order compelling the defendant to

transfer sufficient assets[4] into the State of Connecticut to satisfy the attachment entered by the court in plaintiff's favor. Id. at 244. Judge Arterton held that the Court had "personal jurisdiction over [defendant]; thus, if justice and the reasonable demands of the situation warrant, this court may order the defendant to do or refrain from doing, certain acts in another state." Id. at 246. Her opinion emphasized that "it is within this court's power to effectuate a prejudgment remedy issued under Connecticut law by ordering the parties over whom the court has *in personam* jurisdiction to bring such assets into Connecticut for purposes of attachment." Id. at 246. The Court expressly held that "although this prejudgment remedy may have the effect of an injunction, such order of attachment need not satisfy the requirements of Fed. R. Civ. P. 65." Id. at 246. "Rather, the party seeking this ancillary order need only establish probable cause". Id. at 247.

GAI respectfully submits that this Court should take the same approach, treating the request for an order directing Defendants to transfer assets to Connecticut as a matter ancillary to the power to grant a prejudgment remedy on a probable cause standard. It is self-evident that the lack of such an order will nullify GAI's statutory right to obtain security for its damages in advance of judgment – a right for which it has amply satisfied the probable cause threshold.

## B.   ORDER ON PRELIMINARY INJUNCTION BASIS

Although GAI urges the Court to order transfer of assets in reliance on Judge Arterton's well-reasoned decision in Lyons Hollis and the authorities cited in that

---

[4]   The assets sought in Lyons Hollis were various property assets, that were sought under Conn. Gen. Stat. §52-422, Order Pendente Lite, which allows for attachment under § 52-278d, the prejudgment remedy statute. Id., at 245.

opinion, GAI acknowledges that other cases have analyzed applications for orders to transfer assets under the injunction standard. See, e.g., Metal Management, Inc. v. Schiavone, 514 F. Supp. 2d 227, 240 (D. Conn. 2007). "In [the Second C]ircuit a preliminary injunction will be issued when there is a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc., 749 F.2d 124, 125 (2d Cir. 1984).

The preliminary injunction standard is satisfied here and justifies an order directing Defendants to bring assets into the state to secure a prejudgment remedy.

### 1. GAI is Exposed to Irreparable Harm Absent Adequate Security.

"If an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found."  Metal Management, Inc., 514 F. Supp. 2d at 240.  "[A]lthough injuries compensable by monetary damages ordinarily do not give rise to irreparable harm, see Borey v. National Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991), "[a] preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." Gelfand v. Stone, 727 F.Supp. 98, 100 (S.D.N.Y. 1989) (citing Republic of the Philippines v. Marcos, 806 F.2d 344, 356 (2d Cir. 1986), cert. dismissed, 480 U.S. 942 (1987), cert. denied, 481 U.S. 1048 (1987); In re Feit &

Drexler, Inc. (Green v. Drexler), 760 F.2d 406, 416 (2d Cir. 1985))." Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77, 86-87 (2d Cir. 1996).

GAI respectfully submits that the conduct of DSI and the individual Defendants manifests a calculated attempt to deprive GAI of compensation for its efforts in support of TETR applications, and to retain for the Defendants' benefit the portion of TETR proceeds paid to DSI that would otherwise be due to GAI, whether on a contract or other theory of liability. This in turn provides a firm basis for an inference that these Defendants, if unconstrained by an order of this Court, will attempt to further their scheme by placing assets beyond the reach of judicial process. While such process might eventually allow GAI to recover such assets on a fraudulent transfer theory or otherwise, there is no question that GAI would suffer irreparable harm in delay, added expense and uncertainty about its ability to collect the judgment from a solvent defendant.

In Transamerica Rental Finance Corp. v. Rental Experts, 790 F. Supp. 378 (1992) (WWE), this Court held that the substantially similar prospect of insolvency rose to the level of irreparable harm. "What is in doubt is [the defendants'] ability to pay … an adverse judgment." Id. at 382. While the prospect of inability to pay arose in that case from a record demonstrating progressive deterioration in the defendants' business, the analogy holds here because the assets in question can readily be dissipated by Defendants. In Transamerica Rental, this Court held that the potential for dissipation satisfied the burden of proving irreparable harm. Id.

The Court should reach the same conclusion here, based on conduct by the Defendants evincing a clear intent to evade any obligation to pay GAI and to frustrate

GAI's right to compensation for extensive and valuable work by which DSI has reaped and continues to reap substantial benefits.[5]

## 2.    GAI Satisfies the Alternative Criteria for Likelihood of Success

Issuance of a preliminary injunction also requires a showing of "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."    Roso-Lino Beverage Distributors, Inc., supra, 749 F.2d at 125.

GAI has established likelihood of success on the merits.    Indeed, it does not appear there is any genuine dispute that DSI has received payments from its clients on TETR applications on which GAI exclusively provided the data analysis and tax form preparation support.    Obviously GAI is entitled to be compensated for these services; just as obviously, DSI has unilaterally and without justification refused to do so in accordance with a course of performance settled over a period of years, and in fact has refused to pay GAI anything at all on recent payments to DSI totaling over a million

---

[5]   Confusion about the relationships among the corporate and individual defendants adds to concerns about the collectability of a judgment in GAI's favor.    Most conspicuously, Defendants do not seem to know whether DSI has a principal place of business in Morgan Hill, California: they have both pleaded that it does not, see Defendants' Answer and Counterclaims (doc. 22, June 25, 2012), paragraph 2, and submitted a sworn statement that it does, see Affidavit of Michael Lundy (doc. 24, June 26, 2012), paragraph 2.    Preliminary research on behalf of GAI moreover suggests that there may be multiple entities with the DSI name under common or interlocking ownership in multiple jurisdictions.    These matters may have to be clarified in discovery.    For present purposes, the point is that Defendants' inconsistent statements reinforce the conclusion that uncertainty about DSI's ability to satisfy a judgment rises to the level of irreparable harm.    GAI should not have to play a shell game among entities the Defendants themselves apparently have difficulty keeping straight.

dollars.  GAI has advanced multiple theories on which DSI likely will be held liable for these actions.

In the alternative, GAI has established that its claims raise serious questions on the merits and that the balance of hardships tips decidedly in its favor.  This branch of the preliminary injunction analysis acknowledges the reality that preliminary injunctive relief should not be confined to simple or easy cases, but should be available "in situations where [a District Court] cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 36 (2d Cir. 2010).  The added requirement that the balance of hardships tip decidedly in favor of the movant makes this standard as meaningful as the "likelihood of success" rubric. Id.

By this alternative standard, GAI has made the necessary showing.  It is self-evidently likely that GAI will succeed on at least that part of its claims pertaining to successful TETR applications on which DSI has admitted receiving payments from its clients (see Exh. C) but has to date paid GAI nothing.  Even if DSI persuades the Court that the probability of success falls above the "probable cause" prejudgment remedy threshold but below a "more likely than not" threshold arguably applicable on a "likelihood of success" test, GAI has more than raised questions on the merits sufficiently serious to make them a fair ground for litigation.

As to balance of hardships, GAI repeats that lack of security creates a significant risk that its entitlement to compensation could be entirely frustrated, or if not defeated altogether, then delayed and eroded by potentially lengthy collateral proceedings to

undo transfers Defendants are now at liberty to make.   By their recent actions, Defendants have done nothing to merit any presumption that they will not make the most of the opportunity to keep for themselves what they have previously committed to pay GAI.

The hardship to Defendants is negligible.   Assuming GAI's work in all instances reaches the 20% cap, DSI itself will receive four dollars for every dollar it owes GAI.   If the 20% cap is not reached, the ratio is even more in DSI's favor.   Thus, even if the Court issued a preliminary injunction requiring DSI to bring assets to Connecticut sufficient to protect GAI's share of these payments, DSI would still have the benefit of roughly four-fifths of incoming proceeds on TETR applications – and would be temporarily deprived only of the one-fifth of such proceeds that is the subject of GAI's claims.   In this balancing, the only "hardship" to DSI is the ability to keep and dissipate the portion of payments in relation to TETR applications that DSI should be paying to GAI.   This is not a "hardship" deserving of any weight in the balancing portion of the injunction analysis.

### C.      Alternative Relief: Enjoin Transfer of 20% of TETR Payments

If the Court for any reason declines to order DSI to bring assets to Connecticut sufficient to secure a prejudgment remedy, the Court should at a minimum enjoin the Defendants from using or transferring 20% of any payment received from DSI clients on TETR applications that GAI prepared or that were in process at the time DSI purported to terminate the parties' relationship.   The Court should further direct Defendants to deposit such funds either in the registry account of the Court or in an account in Connecticut, and to leave such funds on deposit during the pendency of this litigation or

until further order of the Court. Such on order should also provide that Defendants must notify the Court and GAI whenever the IRS rules on any such client's TETR application, whenever the Defendants learn that the IRS has issued a refund payment, and whenever DSI itself receives a payment. To the extent DSI receives a partial payment, it should also advise the Court and GAI how much more is due and when it is expected to be paid.

This relief would at least protect the portion of such payments that is the subject of the claims on which GAI has demonstrated probable cause, and would do so on an ongoing basis as payments are received. An order to this effect would be justified either as a measure ancillary to the prejudgment remedy probable cause finding or on a preliminary injunction basis, in each instance on the grounds stated in sections III.A. and III.B. of this Memorandum.

IV.   **CONCLUSION**

For the reasons set forth above, GAI has demonstrated that there is probable cause to support its claims and that it is entitled to a prejudgment remedy pursuant to Conn. Gen. Stat. § 52-278 et seq. in the amount of $1,932,068.65.

GAI respectfully requests that the Court order Defendants to identify assets sufficient to secure this amount, and to bring such assets to Connecticut to be attached if not already located in the state.  GAI submits that the Court has the inherent power to order this relief ancillary to the grant of a prejudgment remedy under the Connecticut statute, or in the alternative, that such relief is available and warranted as a preliminary injunction.   At a minimum, the Court should enjoin the Defendants from using or transferring that amount of funds received from TETR application clients.

> The PLAINTIFF,
> Garnet Analytics, Inc.
>
> By:   */s/ Christopher P. McCormack*
> Christopher P. McCormack (ct 03251)
> Alison M. Perry (ct 28482)
> Pullman & Comley, LLC
> 850 Main Street, P.O. Box 7006
> Bridgeport, CT  06601-7006
> Telephone 203 330 2000
> Facsimile 203 576 8888
> Its Attorneys

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was electronically delivered or mailed on: 2nd day of July, 2012 to all counsel and pro se parties of record.

/s/ Christopher P. McCormack
Christopher P. McCormack