UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| : | |
| GARNET ANALYTICS, INC.   : | |
| : | |
| : | |
| : | |
| v.   : | CIV. NO. 3:12CV716 (WWE) |
| : | |
| DIVERSIFIED SOLUTIONS, INC.,   : | |
| MICHAEL LUNDY, and BRIAN SOL   : | |
| : | |
| : | |

## AMENDED RULING ON PLAINTIFF'S APPLICATION
## FOR PREJUDGMENT REMEDY

Plaintiff, Garnet Analytics, Inc., ("Garnet"), brings this action to recover payment and damages for breach of contract.[1] [Doc. #1; Doc. #27 at 1]. Defendants are Diversified Solutions, Inc. ("DSI"); Michael Lundy, President of DSI; and Brian Sol, Vice President of DSI (collectively "defendants").

Beginning in 2008, Garnet and its predecessor, Kaskie Plude and Company, LLC ("Kaskie Plude"), provided analytical services to DSI including preparation of tax studies and Internal Revenue Service tax returns for DSI clients in support of the clients'

---

[1]By complaint dated May 14, 2012, plaintiff alleges breach of contract (against DSI), breach of the implied covenant of good faith and fair dealing (against DSI), promissory estoppel (against DSI), quantum meruit (against DSI), negligent misrepresentation (against DSI), fraud (against all defendants), and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a to 110q (against DSI). [Doc. #1].

telephone excise tax refund ("TETR") claims, and DSI agreed to compensate Garnet for doing so. Defendant instructed plaintiff to stop work on DSI projects on April 3, 2012. Plaintiff filed this action on May 14, 2012, to recover payment for services rendered in addition to punitive damages and attorneys' fees.

In plaintiff's initial application for prejudgment remedy ("PJR"), Garnet sought $1,932,068.65.[1] [Doc. #27]. This amount represented actual damages of $1,095,452.77 for completed pending TETR applications, and $507,137.50 for TETR applications not fully completed or submitted at the time DSI terminated the parties' relationship. [Pl. Ex Q and S].  Plaintiff also sought a prejudgment award of punitive damages and attorneys' fees, calculated at twenty-five percent of actual damages [Doc. #28 at 26-7].  Evidentiary hearings were held on January 30, and March 11, 12, and 13, 2013.

On March 14, 2013, plaintiff's Application for Prejudgment Remedy was granted in the amount of $1,602,690.27. [Doc. #113]. The Court declined to award a PJR for punitive damages, future attorneys' fees and costs, without prejudice to plaintiff's filing a motion to increase the PJR with supporting documentation on a more developed record as additional fees and costs were

---

[1] Evidentiary hearings on plaintiff's Application for Prejudgment Remedy were held on January 30; March 11, 12 and 13; and September 9, 11, 12 and 27, 2013.

incurred.  As set forth in the ruling, the hearing was suspended due to the history of defendants' failure to produce timely and/or meaningful responses to discovery and expert disclosures that would enable plaintiff to cross examine defendants' witnesses and respond to their defenses, set-offs and counterclaims at a continued hearing.

Thereafter, discovery was conducted. On August 27, 2013, the Court granted plaintiff's Motion pursuant to Fed. R. Civ. P. 37, finding that defendants failed to file timely responses or objections to plaintiff's First Set of Interrogatories and Production Requests dated December 10, 2012, and failed to cure the deficiencies despite ample opportunity to do so. Objections to plaintiff's discovery requests were waived. Fact and expert discovery was closed and defendants were limited to the discovery and production responses and production provided.  In addition, the Court precluded defendants from offering any expert testimony at the continued PJR hearing or at trial. Plaintiff's Rule 37 request for attorneys' fees and costs was granted. [Doc. #258].[2]

Continued evidentiary hearings were held on September 9, 11, 12, and 27, 2013. The evidence in support of the PJR application

_____

[2] On November 7, 2013, the Court granted, absent objection, plaintiff's Motion for Attorneys' Fees in accordance with the Rule 37 ruling in the amount of $54,145. [Doc. #308].

and defenses and setoffs closed on September 27, and the parties delivered closing arguments.

## PROBABLE CAUSE STANDARD

To grant a prejudgment remedy ("PJR") of attachment, the court must make a finding of "probable cause." Connecticut General Statutes § 52-278c(a)(2) requires that the application include:

> An affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff.

Connecticut General Statute §52-278d provides that a PJR hearing is limited to a determination of "whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff."

"Probable cause," in the context of a prejudgment remedy, has been defined by Connecticut courts as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  Three S.

Dev. Co. v. Santore, 193 Conn. 174, 175 (1984) (quotation marks and citation omitted).

In other words, in addressing PJR applications, the "trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." Calfee v. Usman, 224 Conn. 29, 36-37 (1992) (citation omitted). A probable cause hearing for the issuance of a prejudgment remedy "is not contemplated to be a full scale trial on the merits of the plaintiff's claim." Id. at 37. The plaintiff need only establish that "there is probable cause to sustain the validity of the claim." Id. Probable cause "is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." New England Land Co. v. DeMarkey, 213 Conn. 612, 620 (1990) (citation omitted).

After a hearing, the Court considers "not only the validity of the plaintiff's claim but also the amount that is being sought." Calfee, 224 Conn. at 38. The Court will make a determination of how much of the defendant's property may properly be attached in order to safeguard the collectibility of a potential future judgment in favor of the plaintiff." Calfee, 224 Conn. at 39. "[D]amages need not be established with precision but only on the basis of evidence yielding a fair and

reasonable estimate." <u>Burkert v. Petrol Plus of Naugatuck, Inc.</u>, 5 Conn. App. 296, 301 (1985) (citation omitted).

"[T]he Court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant." <u>Haxhi v. Moss</u>, 25 Conn. App. 16, 20 (1991) (citation omitted).

## FINDINGS

After eight days of hearings and for the reasons set out below, the Court amends its prior ruling on plaintiff's application for prejudgment remedy.

## Count One: Breach of Contract

The Court previously found the existence of a contract and made a finding on contract damages. The Court weighed the evidence and testimony presented during the continued hearings in September and is not persuaded by defendants' testimony or argument regarding the absence of a contract between Garnet and DSI.  However, after due consideration of defendants' evidence, the amount of the PJR is amended as set forth below.

"The general rule of damages in a breach of contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed . . . . Damages for breach of contract are to be determined as of the time of the occurrence of the breach." <u>Gazo v. City of Stamford</u>, 255 Conn. 245, 264-65 (2010) (citation omitted).

For the completed TETR claims, the Court awards compensation as calculated under the twenty percent (20%) cap on DSI's payment from the client, as set forth in defendants' Exhibit 1045, in the amount of $610,081.83. The Court leaves for trial plaintiff's argument that compensation should be fixed at twenty percent (20%) cap at the contract rate, regardless of whether DSI discounted its fee with the client and/or regardless of whether the TETR refund claim was denied by the IRS.

For the TETR claims in progress, the Court awards compensation calculated at the value of the total hours of $507,137.50, which is less than the capped twenty percent (20%) damages calculation of $565,210.04.  Plaintiff asks the Court to calculate the value of TETR claims in progress on the value of services, regardless of the cap. Garnet argues under the doctrine of prevention performance that the value of the time put into these projects reflect a species of reliance and expectation damages plaintiff performed under the contract.  See  Martin v. Kavanewsky, 157 Conn. 514, 519-20 (1969) ("where the defendants prevented full performance of the contract, the plaintiff is permitted a recovery for the reasonable value of the services which he has performed, without regard to the extent of the benefit conferred upon the other party to the contract.") (internal quotation marks and citations omitted); Kastner v. Beacon Oil Co., 114 Conn. 190 (1932) ("It is also the rule that

in all cases of prevention of performance, where the plaintiff has been deprived by the defendant of the benefit of the contract, the plaintiff is entitled to recover what he has lost by the act of the defendant.") (internal quotation marks and citation omitted); Bloomberg Assoc. Worldwide, Inc. v. Brown & Brown of Connecticut, Inc., 132 Conn. App. 85, 94-95 (2013)("Under the doctrine, if a party to a contract prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, that party is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance.") (internal quotation mark and citation omitted).

The Court credits the testimony and evidence showing that DSI used Garnet's work product without compensation and provided Garnet's work product to Kondler. Pl. Ex. JJJ, PP, KKK, LLL CC, DD, YY, N, MMM. In reaching this decision, the Court recognized that defendants did not provide Kondler work product in discovery, provided little or no disclosure of documents about the disposition of the accounts identified as "work in progress" claims, and did not bring their Kondler witness to Court for proper cross examination.[3] See Pl. Ex. S. It is DSI's position

---

[3] The Court weighed defendants' failure to produce timely discovery when considering plaintiff's standing objection to Michael Lundy's testimony that certain TETR applications had to be "completely redone" based on a new study prepared by Kondler.

that Garnet is entitled to be paid the "reasonable value" of
services performed prior to the termination of the agreement.
Defendants did not provide a breakdown of the client refunds for
work in progress and assign reasonable value due to Garnet for
work performed, despite being asked by the Court to provide
evidence to support their position.  [See Doc. #279]. Indeed,
defendants conceded that Garnet should be "paid for the
reasonable value of their services in most incidences," as
reflected in DSI's contract with Kondler. [9/27/13 Tr. at 219-
220].

        Plaintiff also argued that DSI failed to include amounts
received by the clients reflecting additional interest recovered
on the TETR refunds which was not included in the checks provided
in defendants' exhibits 1043 and 1045. Specifically, plaintiff
contends that defendants' exhibits 1043 and 1045 do not represent
a ceiling on the amount DSI received based on Garnet's work, and
therefore do not represent a ceiling on the recovery Garnet is
entitled to seek in this case.  Defendants argue that any award
regarding recovery of interest on the TETR claims is speculative
as "there is no evidence before this Court that DSI has ever
received any money from the IRS on behalf of its clients
recovering interest in cases where the Pludes submitted the TETR
application." [9/27/13 Tr. at 221]. However, the Court finds that
the lack of such evidence rests squarely on defendants and their

failure to comply with discovery. [Doc. #258]. The Court credits Denise Plude's testimony that discovery materials provided by defendants on clients identified as "file not paid" included subsequent "emails discussing the fact that claims were being filed for additional interest on these claims" and requests for additional interest were on-going after DSI received payment from the client.  [9/27/13 Tr. 12:21-23; 13-38:2; Pl. Ex. FFF, GGG, HHH, III].  Nevertheless, on this record the Court is hard put to assign a figure to this interest calculation for each TETR filing.

Finally, plaintiff argues, and the Court agrees, that defendants' assertion that Garnet should not be compensated for "file not paid" and "work in progress" is problematic due to the fragmentary disclosure of the Kondler work product, with little or no disclosure regarding the disposition of TETR claims, and defendants' failure to bring a representative from Kondler to the hearing to be cross examined on these subjects. On this record, defendants have not demonstrated that any TETR claims failed because of Garnet.

| | |
|---|---|
| TETR claims filed | $  610,081.83 |
| TETR claims in progress | $  507,137.50 |
| **TOTAL** | **$1,117,219.30** |

Based on the evidence presented, the Court finds probable cause to believe that a judgment in the amount of at least $1,117,219.30 will be rendered in favor of plaintiff on Count One in a trial on the merits. Calfee v. Usman, 224 Conn. 29, 36-37 (1992); see Conn. Gen. Stat. §52-278c(a)(2). The Court stresses that this is a probable cause finding and the calculation of damages on the breach of contract claim may be modified at trial in accordance with the burden of proof.

## Count Six:  Fraud

Through the testimony of Michael Plude and Denise Plude, plaintiff Garnet Analytics Inc. established probable cause to believe that plaintiff will prevail on the fraud claim set forth in Count Six of the complaint against DSI, Michael Lundy and Brian Sol. The evidence supports a probable cause finding that defendants made false representations as a statement of fact; the representations were untrue and known to be untrue by the party making them; the representations were made to induce Garnet to act upon them; and Garnet acted upon these false representations to its injury.  [Doc. #28 at 20, citing Garrigus v. Viarengo, 112 Conn. App. 655, 663-64 (2009)].

Plaintiff argues there is probable cause to find that Michael Lundy and Brian Sol individually and as agents of DSI made false representations about future payment for work performed, intending to induce reliance by Garnet. Regarding

compensation, Michael Plude testified that Lundy made representations in a series of discussions in May and June 2009, during which Michael Plude expressed concern that the TETR applications to date consisted of smaller claims that did not yield fees commensurate with the effort required to process and prepare them. As Garnet's time investment became larger and larger, defendant Lundy promised large upcoming payouts from clients referred to as "whales." The Court credits Michael Plude's testimony that Lundy represented that the DSI compensation rate for a smaller client was twenty-five percent (25%) and for a larger client, or "whale," a tiered fee structure of twenty-five percent (25%) for the first million dollars of the refund, and then twenty percent (20%) thereafter.  Michael Plude stated that the idea of capping Garnet's payment at twenty percent (20%) of DSI's fee was Lundy's, based on his assessment of DSI's overhead costs. Michael Plude testified that when negotiating hourly fee rates, Lundy communicated understanding that he was happy there was a twenty percent (20%) limitation on hourly rates charged. Michael Plude learned after the fact that DSI discounted its commission rate with Baker Hughes to a fifteen percent (15%) fee, resulting in Garnet receiving less money.  The Court credits Michael Plude's testimony on this understanding and Denise Plude's testimony that there were multiple discussions and

email exchanges with Lundy and Sol regarding disclosure of commission rates.  [9/27/13 Tr. 129:1-131:21; Pl. Ex. EEE].

On this record, plaintiff argues that defendants intended that Garnet rely on the expectation of larger payments for future work, but these representations were false when made because defendants did not reveal fee discounts and later interposed pretextual rationalizations to bar Garnet from further involvement and to deny Garnet the agreed-to share of refunds received as a result of Garnet's efforts.  Garnet argues that intent can be inferred by defendants' actions, in particular Brian Sol and Michael Lundy's otherwise inexplicable and arbitrary deviation from years of invoice practice as the accepted form of payment for Garnet's services. Plaintiff further contends defendants had an obligation under the agreement to disclose their rate discounts with clients, and disclose their intent to terminate the business relationship before the "systematic looting" of Garnet's work product without compensation. The Court credits Michael Plude's testimony that Garnet's work product for "Amended TETR" claims for Clients Four and Five were directly plagiarized and/or photocopied by Kondler. [Compare Pl. Ex. EE and FF; GG and HH; NNN].

Plaintiff cites Scribner v. O'Brien, Inc., 169 Conn. 389, 404 (1975) and Sturm v. Harb Development, LLC, 298 Conn. 124, 132 (2010), to support a finding of individual liability in tort of a

corporate agent or officer as to defendants Michael Lundy and

Brian Sol.

> It is well established that an officer of a
> corporation does not incur personal liability for
> its torts merely because of his official position.
> Where, however, an agent or officer commits or
> participates in the commission of a tort, whether
> or not he acts on behalf of his principal or
> corporation, he is liable to third persons injured
> thereby . . . .  Thus, a director or officer who
> commits the tort or who directs the tortious act
> done, or participates or operates therein, is
> liable to third persons injured thereby, even
> though liability may also attach to the
> corporation for the tort.

Strum, 298 Conn. at 132-33 (quoting Ventres v. Goodspeed

Airport, LLC, 275 Conn. 105, 141-42 (2005), cert. denied, 547

U.S. 1111 (2006)) (citing cases); Scribner, 189 at 404 (While it

is "true that an officer of a corporation does not incur personal

liability for its torts merely because of his official position.

Where, however, an agent or officer commits or participates in

the commission of a tort, whether or not he acts on behalf of his

principal or corporation, he is liable to third persons injured

thereby.") (citations omitted). Individual tort liability may be

imposed "without requiring the piercing of the corporate veil."

Strum, 298 Conn. at 133 (citing Ventres, 275 Conn. at 105).  The

evidence shows that DSI, Brian Sol and Michael Lundy, jointly and

severally, knew that their representations regarding DSI's fees

were untrue, that claiming breach of the contract was a pretext

to avoid paying Garnet for its services and work product and that DSI, Lundy and Sol provided Garnet's work product to Kondler for Kondler's use. Indeed, the record shows that defendants' relationship with Kondler predates the termination of the relationship with Garnet, [Pl. Ex. PP, Tabs 1-2, 4, 24, 29 Ex. OO, SS], and beginning in mid-February through March, 2012, as defendants requested information from Garnet on clients whose work was in progress, DSI project managers were providing Kondler with Garnet work product, which Kondler later appropriated as its work. [Pl. Ex. CC, GG].

On this record, the Court finds probable cause that plaintiff will prevail on its claim that defendants' conduct was fraudulent.

## Count Seven: Violation of the Connecticut Unfair Trade Practices Act

Based on the evidence supporting the fraud count, the Court also finds that plaintiff has established probable cause to prevail under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110b(a) to 42-110q.

> The central prohibition of CUTPA is contained in §42-110b(a) which provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a given action is "unfair," the Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act. According to the cigarette rule, a court must consider:

> (1)[W]hether the practice, without necessarily
> having been previously considered unlawful,
> offends public policy as it has been established
> by statutes, the common law, or otherwise-whether,
> in other words, it is within at least the penumbra
> of some common law, statutory, or other
> established concept of unfairness; (2) whether it
> is immoral, unethical, oppressive, or
> unscrupulous; (3) whether it causes substantial
> injury to consumers [(competitors or other
> businessmen)].

Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1038

(2d Cir. 1995) (quoting Atlantic Richfield Co. v. Canaan Oil Co.,

202 Conn. 234, 239, 520 A.2d 1008, 1012 (1987) (alterations in

original)).

The Court finds probable cause under the cigarette rule that

DSI's conduct offended public policy, was "immoral, unethical,

oppressive and unscrupulous" because it was willful and

fraudulent; and there was an ascertainable loss.  As set forth

above in more detail, the Court considered defendants' lack of

good faith and willful disregard of Garnet's rights; defendants'

failure to disclose DSI's rate structure despite numerous

requests; defendants' appropriation of Garnet's work product and

DSI's prolonged refusal to pay on pretextual grounds.

Connecticut courts hold that a "simple contract breach is

not sufficient to establish a violation of CUTPA, particularly

where the count alleging CUTPA simply incorporates by reference

the breach of contract claim and does not set forth how or in

what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." Boulevard Assoc., 72 F.3d at 1039 (quoting Chasbek Mfg. Corp. v. Tandet, 1995 WL 447948, at *12 (Conn. Super. Ct. June 16, 1995)). "In order that a breach of contract action also serve as a CUTPA violation, a plaintiff must show "substantial aggravating circumstances intending to breach.'" City of Bridgeport v. Aerialscope, Inc., 122 F. Supp. 2d 275, 278 (D. Conn. 2000) (citing Greenwich Capitol Fin. v. Citicorp Mtg., 1999 WL 293912 at *3 (Conn. Super. 1999)); accord, Boulevard, 72 F.3d at 1038 (CUTPA requires "aggravating circumstances surrounding the breach."). Here, plaintiff does not solely rely on the breach of contract allegations to support its CUTPA claim. Rather, the evidence set forth above in support of a probable cause finding of fraud provides the "aggravating circumstances" to support a violation of CUTPA. "Connecticut courts have permitted a CUTPA cause of action based on a breach of contract where there are aggravating circumstances attending the breach such as where there has generally 'been some type of fraudulent behavior accompanying the breach or aggravating circumstances.'" Caires v. JP Morgan Chase Bank, NA, 880 F. Supp. 2d 288, 300 (D. Conn. 2012) (quoting Pace v. North Haven Academy, LLC, No. CV096005922S, 2010 WL 2108491, at *3 (Conn. Super. Ct. April 23, 2010)). "'Conduct that has been held to be substantial

aggravating circumstances sufficient to support CUTPA claims includes fraudulent representations, fraudulent concealment, false claims . . . and multiple breaches of contract.'" Id. (quoting Leonard v. Tabacco Const., LLC, No. CV095014717, 2012 WL 2149402, at *6 (Conn. Super. Ct. May 10, 2012) (internal quotation marks and citations omitted)).

On this record, the Court finds probable cause that plaintiff will prevail on its claim that defendants' conduct violated CUTPA.

## Attorneys' Fees

Plaintiff seeks $747,000 in attorney's fees and $51,000 in costs to date, under the terms of the contract and under CUTPA.[4] The Court calculates attorneys' fees in the amount of $747,000 and $51,000 in costs. The attorneys' fees of $747,000 includes $54,145 previously awarded on November 7, 2013, [doc. #308], which if unpaid as of the date of this ruling and order shall be included in the PJR attachment.  [9/27/13 Tr. 91:8-19].

## PJR Interest

In addition, Garnet seeks to secure prejudgment interest on the prejudgment remedy, awarded from the date the contract was

---

[4] Plaintiff filed an application for attorney's fees incurred in the connection with the discovery disputes and motion practice underlying the litigation of the PJR Application and motion practice regarding defendants' counterclaims. The Court awarded attorney's fees in the amount of $54,145, on November 7, 2013. [Doc. #308].

breached April 3, 2012.[5] "When the Court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law." Brandewiede v. Emery Worldwide, 890 F. Supp. 79, 82 (D. Conn. 1994) (citing Galvin v Newton, Civ. No. B-88-597 (WWE), 1991 WL 218485, *3 (D. Conn. Sept. 18, 1991)).  Under Connecticut law, prejudgment interest "may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." Conn. Gen. Stat. §37-3a.[6]  "An award of prejudgment interest pursuant to Section 37-3a is an equitable determination within the discretion of the court."  Brandewiede, 890 F. Supp. at 82 (citing Prime Management Co. v. Steinegger, 904 F.2d 811, 817 (2d Cir. 1991)).

Among the factors which the court may consider in deciding to award prejudgment interest are: 1) "whether the detention of money was wrongful under the circumstances"; 2) "whether the sum recovered was a liquidated amount; and 3) "whether the party seeking prejudgment interest has 'diligently presented' the claim throughout the course of the proceedings." Prime Management Co., 904 F.2d at 817 (quotation marks and citations omitted).

---

[5] April 3, 2012, is the date Michael Lundy sent Denise Plude an email instructing Garnet to "quit working on any of [DSI's] projects and send us all the materials, all the work product, and [Garnet's] invoices for your hours for each client."  Pl. Ex. P.
[6] Section 37-3a provides in relevant party, that "an interest rate of ten percent a year, and not more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." Conn. Gen. Stat. §37-3a.

As set forth above, the Court finds that plaintiff has demonstrated probable cause to believe that judgment in the amount of $1,915,219.30 will be rendered in Garnet's favor at a trial on the merits of the breach of contract, fraud and CUTPA claims.  As set forth above, the Court finds probable cause that defendants' detention of the money was wrongful on the basis that their conduct was willful and fraudulent. The damages amount is reasonably ascertainable and the record shows that Garnet diligently presented its claim for payment since April 2012.  See Dunleavey v. Paris Ceramics USA, Inc., No. CV02-0395709S, 47 Conn. Supp. 565, n. 7 (Conn. Super. Ct. Dec. 16, 2002) (factoring "into the amount of the prejudgment remedy an amount of prejudgment interest that is likely to accrue during the pendency of the action . . . ."); Newinno, Inc. v. Peregrim Dev, Inc., No. CV.020390074S, 2004 WL 1098753, *4  (Conn. Super. Ct. Apr. 27, 2004) (denying prejudgment interest on the amount of the prejudgment remedy finding plaintiff did not show a probability of recovering prejudgment interest as part of a final award of damages.); TES Franchising, LLC v. Feldman, 286 Conn. 132, n. 16 (2008) (noting that prejudgment interest is available as part of a PJR award if there is a probable cause showing that prejudgment interest would be awarded as damages at trial.").

Accordingly, there is probable cause to add prejudgment interest on the sum of $1,915,219.30 in the amount of $327,424.41 from April 3, 2012 through December 18, 2013.[7]

## AMOUNT OF THE PJR ATTACHMENT

| | |
|---|---|
| TETR claims filed | $  610,081.83 |
| TETR claims in progress | $  507,137.50 |
| Attorneys' Fees | $  747,000.00 |
| Costs | $   51,000.00 |
| **TOTAL PJR** | **$1,915,219.30** |
| PJR interest | $  327,424.41 |
| **TOTAL PJR with Interest** | **$2,242,643.70** |

The Court declines to include punitive damages in the attachment at this time.

The Court declines to order an attachment for future attorneys' fees and costs at this time. Plaintiff may file a motion to increase the PJR with supporting documentation on a more developed record as additional fees and costs are incurred.

---

[7] This total represents a simple interest calculation at the statutory rate of ten percent (10%) per year. Simple interest calculated from April 3, 2012 through April 2, 2013, is $191,521.93. For 2013, the calculation of simple interest from April 3, 2013 through December 18, 2013, is $524.72 per day or, for two hundred, fifty-nine days, $135,902.48.

**CONCLUSION**

The Court's ruling on plaintiff's Application for a Prejudgment Remedy **[Doc. #113]** is AMENDED and MODIFIED. Plaintiff's Application for a Prejudgment Remedy **[Doc. #27]** is **GRANTED** in the amount of $**$2,242,643.70,** against defendants DSI, Matt Lundy and Brian Sol. Defendant DSI, Michael Lundy and Brian Sol are hereby ordered to bring assets to Connecticut for attachment within fourteen (14) days. Alternatively, defendants may elect to post a cash bond equal to the amount of the prejudgment remedy, or the amount by which the assets brought to Connecticut and made available for attachment falls short of the amount of the prejudgment remedy.

Plaintiff's Amended Motion in Limine **[Doc. #263]** pursuant to Fed. R. Civ. P. 37 for defendants' failure to respond to discovery is **GRANTED** in accordance with rulings made during the evidentiary hearings held September 9, 11, 12, and 27, 2013.  The Motion is **MOOT** to the extent that plaintiff sought to preclude the admission of defendants' exhibits 1032, 1033, 1034 and 1035, 1038A, 1038B, 1039 and evidence concerning the Kondler firm.

This is not a recommended ruling. [6] This is a ruling on an Application for Prejudgment Remedy which is reviewable pursuant

---

[6]See  Aetna Life Ins. Co. v. Toothsavers Dental Serv., No. 96 CV 570 (GLG), 1997 WL 102453 (D. Conn. Feb. 4, 1997) (finding referral to Magistrate Judge "for the purpose of a hearing on prejudgment remedy" was a request for a determination of the

to the "clearly erroneous" statutory standard of review. 28 U.S.C. §636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

Dated at Bridgeport this 18th day of December 2013.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

_____

prejudgment remedy pursuant to 28 U.S.C. §636(b)(1)(A) and was not a recommended ruling effective only upon a District Court Judge's review and adoption, pursuant to 28 U.S.C. §636(b)(1)(B)).